IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 4, 2024

## IN RE BENTLEY R.

**Appeal from the Chancery Court for Madison County**
**No. 82166     Steven W. Maroney, Chancellor**

_____

**No. W2023-01665-COA-R3-PT**
_____

The Chancery Court for Madison County ("the Trial Court") terminated the parental rights of River M. ("Mother") to her son, Bentley R. ("the Child"). Mother appeals, challenging the Trial Court's finding that termination of Mother's parental rights was in the Child's best interest. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Angela Mueller, Trenton, Tennessee, for the appellant, River M.

Amanda Sagely King, Savannah, Tennessee, for the appellees, Keri A. and Scott A.

## OPINION

### Background

In October 2015, the Tennessee Department of Children's Services ("DCS") filed a petition to adjudicate the Child dependent and neglected and for a change in custody of the Child in the Juvenile Court for Henderson County ("the Juvenile Court"). DCS alleged that the Child and his brother, Jimmy H.[1], were dependent and neglected in that Mother had tested positive for methamphetamine, benzodiazepine, and THC in August 2014; tested positive for THC and benzodiazepine in September 2015; tested positive for

_____

[1] Jimmy H. is Mother's child with a different father. He was not the subject of the termination of parental rights proceedings in the Trial Court and is only mentioned here for contextual purposes.

methamphetamine, amphetamine, benzodiazepine, opiates, and THC in October 2015; and was arrested on an outstanding warrant for burglary in October 2015. DCS further alleged that Mother had not followed through with recommended services.

The Juvenile Court entered an order awarding custody of the Child to Keri A. ("Grandmother") and Scott A. ("Step-Grandfather") (collectively, "Petitioners"), the Child's paternal grandparents, in October 2015. In April 2016, the Juvenile Court entered an order adjudicating the Child dependent and neglected. The order reflected that Mother and the Child's father, Brien R. ("Father"), had stipulated that the Child was dependent and neglected and that the Court could adopt the facts alleged in DCS's petition as its findings of fact. The Juvenile Court permitted Mother to have supervised visitation with the Child.

In March 2017, Mother pled guilty to aggravated child abuse, neglect, and endangerment, pursuant to Tenn. Code Ann. § 39-15-402, and received a sentence of eight years to be served on supervised probation in the Circuit Court for Henderson County ("the Circuit Court"). The judgment included a special condition that Mother "must have no contact with the victim in this case (except by Court order)."

On March 6, 2023, Petitioners filed a petition for adoption and termination of Mother's parental rights to the Child in the Trial Court. The Child was born in November 2014 and had been in Petitioners' custody continuously since he was eleven months old. At the time the petition was filed, the Child was eight years old. Father joined in the petition to provide his consent to termination of his parental rights and to Petitioners' adoption of the Child.[2]

Petitioners alleged several grounds for termination but proceeded at trial on only two grounds—(1) severe child abuse, pursuant to Tenn. Code Ann. § 36-1-113(g)(4) and § 37-1-102(b)(27), and (2) sentence of more than two years' imprisonment for severe child abuse, pursuant to Tenn. Code Ann. § 36-1-113(g)(5). Petitioners also alleged that termination of Mother's parental rights was in the Child's best interest, pursuant to Tenn. Code Ann. § 36-1-113(i).

Soon thereafter, Mother filed a request for a court-appointed attorney, expressing that she was not willing to consent to termination of her parental rights. She further alleged that she had tried to establish a relationship with the Child since October 2022 but that Petitioners had not responded to her efforts. The Trial Court then appointed a guardian *ad litem* ("GAL") for the Child and an attorney for Mother.

Mother, through counsel, filed an answer to the petition in June 2023. She denied the allegations supporting the grounds of severe child abuse and a sentence greater than

---

[2] Given that Father consented to the termination of his parental rights and has not otherwise joined in this appeal as an appellant, our focus will be limited to Mother.

two years' imprisonment for severe child abuse, as well as all of the allegations related to the best interest of the Child.

Trial on the petition was conducted in October 2023. Mother testified that the Child was removed from her custody in 2015 after she was incarcerated for aggravated burglary. At the time of the Child's removal, Mother had been using methamphetamine for nine to ten months. Mother further acknowledged that she had pled guilty to severe child abuse based upon the Child's positive test for methamphetamine. Her testimony demonstrated that although she had been through several rehabilitation programs, Mother relapsed into methamphetamine use multiple times while Petitioners had custody of the Child.

Mother testified that she joined a rehabilitation program called Women of Hope in January 2016 and graduated from that program in January 2017. She relapsed into methamphetamine use at the beginning of 2018, violating the conditions of probation. She then entered the Recovery Court program, which she completed in 2019. However, she again relapsed into methamphetamine use in 2020. She was again recommended for the Recovery Court program but was unable to participate in that program a second time due to a car accident that left her hospitalized for a month and bedridden for nine to twelve months. There was no indication from the evidence at trial that the car accident was related to her illegal drug use.

Once she was able to walk again in July 2021, Mother relapsed a third time and was using methamphetamine daily up until she was incarcerated for violating the conditions of probation in December 2021. She was released on supervised probation, which is set to end in 2030. She testified that if she were to violate the conditions of probation again, she would be sent to prison, where she would likely serve out her eight-year sentence.

Mother then entered another rehabilitation program called Aspell Recovery Center in June 2022. She completed that program and, at the time of trial, was living in sober living housing run by an organization called Oxford House. When asked how many times she had "been in" her "addiction", Mother estimated that she had used methamphetamine daily during four or five periods of time since 2015. Mother testified that, as of the time of trial, she was eighteen months sober, her longest period of sobriety.

Step-Grandfather testified that the Child was nearly nine years old at the time of trial and that the Child had lived with Petitioners nearly his entire life. He explained that the Child views Petitioners as his parents. He further stated that Mother is a complete stranger to the Child and that Mother visited the Child only four or five times since 2015. Mother estimated that she visited the Child ten times. The last time the Child had contact with Mother was for approximately ten minutes at a funeral sometime in 2019. Step-Grandfather stated that Mother and the Child had minimal interaction during these visits.

Step-Grandfather also testified that the Child was thriving in Grandmother's and his custody. According to Step-Grandfather, the Child loves his home with them, his family, his school, and his church. Step-Grandfather testified further that the Child has neighborhood friends and a close relationship with Petitioners' youngest son, T.A., who has special needs. Although T.A. is the Child's uncle, the Child and T.A. interact as brothers.

Grandmother's testimony was similar to Step-Grandfather's. Grandmother testified that the Child was in third grade, was on the Honor Roll, and made As with the occasional B. Petitioners both testified that Mother never provided any financial support for the Child.

There was a significant amount of testimony as to whether Petitioners had prevented Mother from visiting the Child after she started to reach back out to them in the latter half of 2022. Mother testified that prior to 2022, Petitioners had always allowed her to visit the Child every time she asked. Mother testified that she did not visit the Child between 2019 and 2022 because she "had trouble with [her] addiction", was in a car wreck, and was "very involved" with her treatment. A series of text messages were admitted into evidence, demonstrating that Mother had requested visits with the Child numerous times from January through April 2023. Petitioners did not respond to these texts with the exception of one reply requesting that Mother direct further communications to their attorney.

Step-Grandfather testified that Petitioners received a text from Mother in September or October 2022. He explained that, at that time, Petitioners had not had contact with Mother since 2019 and knew nothing about her circumstances in 2022. Step-Grandfather testified that Grandmother and he did not prevent Mother from seeing the Child until they realized that her judgment for severe child abuse included a provision that prohibited her from having contact with the Child.

The Trial Court also heard testimony from Carol Copley, the Director of the 26th Judicial District's Recovery Court program, who testified positively of Mother's success in the program, although she acknowledged to having had minimal contact with Mother since her graduation in 2019. Ms. Copley further testified that Mother had relapsed and tested positive for methamphetamine in February 2020. Similarly, Kristie Butler, Director of Women of Hope, testified positively of Mother's participation in that program but also acknowledged to having had no contact with Mother since her graduation in 2017. James Neal, a probation and parole officer, testified that he had been Mother's probation officer since March 2023 and that Mother was on probation for aggravated child abuse, neglect, and endangerment. Mr. Neal explained that Mother had been cooperative and compliant and had passed all of her drug screens, which are administered once per year.

The Child's paternal great-grandmother and Grandmother's mother, Jenny T. ("Great-Grandmother"), testified that the Child has a parent-child relationship with Petitioners and that he refers to them as mom and dad. The Child's paternal uncle, Brandon

R. ("Uncle"), also testified. Uncle testified that he has had custody of Chance R., one of the Child's brothers, for three months. Uncle testified that Mother had been visiting Chance once per month for the past few months, but he expressed his concern about those visits based upon Mother's past drug use. Uncle sees Petitioners weekly and testified that the Child has a "great" relationship with Petitioners and calls them mom and dad.

In a judgment entered on November 8, 2023, the Trial Court terminated Mother's parental rights to the Child, finding that clear and convincing evidence established the statutory grounds of severe child abuse and sentence of more than two years' imprisonment for severe child abuse and that termination of Mother's parental rights was in the Child's best interest. Mother timely appealed.

## **Discussion**

Although not stated exactly as such, Mother raises one issue on appeal: whether the Trial Court erred in finding that termination of Mother's parental rights was in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

[5] Tenn. Code Ann. § 36-1-113(i).

written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

## B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Although Mother does not challenge either of the grounds found against her, the Tennessee Supreme Court has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). Therefore, we will review both of the grounds found against Mother even though she does not dispute either of them.

On March 6, 2023, at the time the termination petition was filed, the relevant statutory grounds for termination read as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds

are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

* * *

(4) The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child;

(5) The parent or guardian has been sentenced to more than two (2) years' imprisonment for conduct against a child that has been found under any prior order of a court or that is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102. Unless otherwise stated, for purposes of this subdivision (g)(5), "sentenced" shall not be construed to mean that the parent or guardian must have actually served more than two (2) years in confinement, but shall only be construed to mean that the court had imposed a sentence of more than two (2) years upon the parent or guardian[.]

Tenn. Code Ann. § 36-1-113(g) (West July 1, 2022 to May 4, 2023). The definition of "severe child abuse" relevant to this case reads as follows:

(27) "Severe child abuse" means:

* * *

(C) The commission of an act toward the child prohibited by § 39-13-309, §§ 39-13-502 -- 39-13-504, § 39-13-515, § 39-13-522, § 39-13-527, § 39-13-531, § 39-13-532, § 39-15-302, § 39-15-402, § 39-17-1004, § 39-17-1005, or the knowing failure to protect the child from the commission of such an act toward the child[.]

Tenn. Code Ann. § 37-1-102(b)(27) (West July 1, 2022 to May 4, 2023).

Both of these grounds were proven by clear and convincing evidence based upon the Circuit Court's judgment. The Circuit Court's judgment reflected that Mother had pled guilty to "Agg Child Abuse/neglect/endangerment", pursuant to Tenn. Code Ann. § 39-15-402, one of the statutes provided for in the definition of severe child abuse in Tenn. Code Ann. § 37-1-102(b)(27)(C). The judgment further reflected that Mother received an eight-year sentence to be served on supervised probation. *See In re Jaylan J.*, No. W2019-02025-COA-R3-PT, 2020 WL 7861378, at *22 (Tenn. Ct. App. Dec. 22, 2020) ("As the statute makes clear, the fact that Mother has not served her sentence in confinement does not preclude application of this ground."); *In re Shyanne H.*, No. M2019-02127-COA-R3-PT,

- 9 -

2020 WL 3481695, at *8 (Tenn. Ct. App. June 25, 2020) ("The fact that Father did not serve any jail time does not preclude termination of his parental rights on this ground."). At trial, Mother acknowledged the accuracy of the judgment and has not otherwise contested the finality or validity of the judgment. We accordingly affirm by clear and convincing evidence the Trial Court's finding of these statutory grounds for termination of Mother's parental rights.

We next address whether the Trial Court erred in finding that termination of Mother's parental rights was in the Child's best interest. When Petitioners filed their termination petition, the statutory best interest factors read as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:
(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
(F) Whether the child is fearful of living in the parent's home;
(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;
(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;
(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;
(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render

the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West July 1, 2022 to May 4, 2023).

With regard to making a determination concerning a child's best interest, the Tennessee Supreme Court has instructed:

- 11 -

When conducting the best interests analysis, courts must consider nine statutory factors[6] listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d [507] at 523 [(Tenn. 2016)] (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d [533] at 555 [(Tenn. 2015)] (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

---

[6] Although there are now twenty best interest factors instead of nine, our Supreme Court's instruction in *In re Gabriella D.*, 531 S.W.3d 662 (Tenn. 2017) still applies.

Mother argues that the Trial Court failed to properly consider all of the best interest factors and failed to make adequate findings of fact and conclusions of law regarding all of the best interest factors. Mother does not identify the factor or factors that the Trial Court supposedly failed to consider. Although the Trial Court did not identify the letter of each relevant factor, it is abundantly clear that the Trial Court considered all relevant best interest factors and provided sufficient findings of fact and conclusions of law.

With respect to factor (A) (the effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority), the Trial Court made the following findings of fact:

> The Court finds termination will absolutely have a positive effect on Child's need for stability and continuity and placement in that he will remain in the home with Petitioners where he has been living for the last eight years since he was aged eleven months. Petitioners have provided him with a nurturing and loving environment, free from any abuse and neglect. All Child's needs including his medical, psychological, educational, and spiritual needs are being met in the home of Petitioners. Petitioner[s] have supplied all of Child's needs for clothing[,] medicine, and school since being placed in their custody. Child lives in a safe neighborhood on a cove, where he lives near other friends and playmates.
>
> Child is in the third grade . . . where he is on the Honor Roll. Petitioners attend his school events. He makes A's and the occasional B.
>
> Child is very bonded to Petitioners and views them as his parents. Without prompting, Child began calling Petitioners "Mom" and "Dad" at an early age; due to his young age and inability to comprehend all the circumstances, Petitioners acquiesced in their "renaming". Child still innocently refers to himself as having been in [Grandmother's] "belly" before his birth. Further, both Petitioners and their extended family have developed a strong bond with Child. Child has especially bonded with Petitioners' son T.A., who has special needs. Child views T.A. as an older brother. Child loves Petitioners, T.A., his home, his school, and . . . Church, where he attends with Petitioners. In short, Child loves the life Petitioners have given him.
>
> Petitioners are committed to supporting Child, are capable of meeting his needs and want to adopt him. Petitioners are the only parents Child knows. Removing Child from Petitioners' custody and changing caregivers would be devastating and traumatizing to Child.[7]

---

[7] Paragraph numbering has been removed from quotes from the Trial Court's final judgment.

The evidence does not preponderate against these findings, and this factor weighs in favor of termination.

Regarding factor (B) (the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition), the Trial Court found that the Child has had "only brief interactions" with Mother since his removal at eleven months old and that he would likely be "confused and disturbed" by "being in the care of a virtual stranger and taken from the only home and parents he recognizes." The Trial Court further found that "returning Child to live with Mother, a recovering addict who resides in a recovery house with other recovering addicts would put Child at risk." The Trial Court additionally reiterated its findings related to factor (A). The evidence does not preponderate against these findings, and this factor weighs in favor of termination.

Concerning factor (C) (whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs), the Trial Court found the following:

> Mother has maintained sobriety for approximately eighteen months at the time of the hearing. However, since Child was removed from her custody, Mother has had multiple relapses into drug usage. She presently lives in the Oxford House, a recovery house with others in various stages of recovery. Mother has yet to establish sustained success in sobriety outside of the treatment environment, although the Court certainly encourages her to persist in this record.
>
> The Court believes it would take an extended period of Mother's demonstrated independent living in a drug free environment before the Court could say she has demonstrated any sort of continuity or stability in meeting the basic material, educational, housing or safety needs of Child.

The evidence does not preponderate against these findings, and we further agree with the Trial Court that Mother's repeated relapses do not demonstrate continuity or stability. This factor weighs in favor of termination.

Regarding factor (D) (whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment), the Trial Court found that there was neither a secure or healthy parental attachment between Mother and the Child nor a reasonable expectation that one could be created given her absence in his life. The Trial Court noted that Mother had visited the Child for a duration of approximately five hours and ten minutes since 2015 and had not seen him since 2019. The evidence does not preponderate against these findings, and this factor weighs in favor of termination.

Although the Trial Court did not explicitly reference factor (E) (whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child), its findings of fact with respect to factor (D) apply also to (E). Mother testified that she visited the Child approximately ten times, but Step-Grandfather testified that she only visited four or five times. The Trial Court appears to have credited Step-Grandfather's testimony over Mother's on this point. However, even if Mother did visit the Child a total of ten times over the course of eight years, this falls far short of what could be considered "regular visitation or other contact." This factor weighs in favor of termination.

Concerning factors (F) and (G), related to a child's fear of living with the parent and whether the parent or her home would exacerbate the child's trauma, the Trial Court made the following findings of fact:

> There is no evidence that Child is fearful of living in the home of Mother, so this statutory factor is of little to no weight in the court's analysis.

> There is a lack of evidence in the record that allows the Court to say that living in the home of Mother would exacerbate any trauma or post-traumatic symptoms of Child (although, as stated elsewhere, the Court finds that living with Mother carries other risks of harm), so this statutory factor is of little to no weight in the court's analysis.

Mother contends that the Trial Court erred by weighing these factors neutrally instead of against termination of her parental rights. This Court has previously affirmed a trial court's decision to weigh these two factors neutrally in the absence of evidence. *See In re Evandor C.*, No. M2022-01697-COA-R3-PT, 2024 WL 678014, at *17 (Tenn. Ct. App. Feb. 20, 2024) (agreeing with the trial court that these factors weighed neutrally when it was "unknown whether he is fearful of living in the parent's home or whether he was traumatized"). We accordingly reject Mother's argument that the Trial Court incorrectly weighed these factors neutrally.

The Trial Court next considered factor (H) (whether the child has created a healthy parental attachment with another person or persons in the absence of the parent) and reiterated its findings related to factor (A). The evidence overwhelmingly demonstrates that the Child has developed parental attachments with Petitioners. The evidence accordingly does not preponderate against the Trial Court's findings, and this factor weighs in favor of termination.

The Trial Court also considered factor (I) (whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these

relationships and the child's access to information about the child's heritage).  The Trial Court found that "termination will not sever critical family relationships, at least on the paternal side" and that Petitioners and Uncle had worked to foster a continued relationship between the Child and his brother, Chance.  The Trial Court further noted that the Child had formed a bond with his other uncle, T.A., who the Child views as his older brother.  The evidence does not preponderate against these findings, and this factor weighs in favor of termination.

The Trial Court considered factor (J) (whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner).  The Trial Court made the following findings of fact:

> Mother, while improving her life, has not yet demonstrated any adjustment of circumstances, conduct, or conditions such that it would be safe for Child to live in her home.

> Child's removal from Mother stemmed from the heavy drug use in the home she maintained for Child.  He was literally removed after being found crying unattended, while Mother was passed out.  Mother has maintained sobriety for the past eighteen months, to her credit.  However, she still resides in the Oxford House with other recovering addicts, where there is an occasional relapse by a resident.  Mother has yet to establish sustained success in sobriety outside of the treatment environment, though the Court certainly encourages her to persist in this record.

> The Court finds the unsafe home environment which Child experienced with Mother, while improved based upon Mother's personal recovery efforts, still represent an unsafe environment for Child which would likely cause Child to be subjected to further abuse or neglect if they returned to that environment.  The Court finds that there is little likelihood that these conditions will be remedied at an early date so that Child can be safely returned to Mother in the near future.  The Court believes it would take an extended period of Mother's demonstrated living independently in a drug free environment before this could be considered.  The Court finds that continuation of Mother and Child's parent-child relationship greatly diminishes [the Child's] chances of early integration into a safe, stable, and permanent home such as he has found and experienced in the care and custody of the Petitioners.

The evidence does not preponderate against these findings. And we further agree with the Trial Court's conclusion that Mother has not demonstrated that her home is yet safe for the Child.

Although we commend Mother on her eighteen months of sobriety, her repeated relapses are concerning, and we agree with the Trial Court that Mother would need to demonstrate an extended period of sobriety while living independently to make her environment and custody of the Child safe. In the meantime, the Child should not be made to linger in uncertainty any longer, particularly given that Mother had eight years to adjust her circumstances, conduct, and conditions in order to provide the Child with a safe and stable environment.

The Trial Court considered factor (K) (whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions), acknowledged that Mother had sought drug rehabilitation and maintained her sobriety for eighteen months, and weighed this factor against termination. The Trial Court appears to have weighed factor (L) (whether DCS has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department) neutrally or as inapplicable. Given the lack of proof in the record relating to this factor, we agree.

Regarding factor (M) (whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest), the Trial Court made the following findings of fact:

> There has been no urgency demonstrated on the part of Mother in terms of establishing any sort of custody arrangement with Child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in Child's best interest.

> Since the time of the removal, the unrebutted testimony at trial is that Mother has made only token visits and has failed to ever provide financial support for Child since his removal. Mother sought visitation by contacting Petitioners in the fall of 2022, some seven years after child's removal.

> Mother has maintained sobriety for eighteen months at the time of the hearing. However, this step came more than seven years after Child's removal from her care. Further, Mother has never petitioned the Henderson County Juvenile Court for increased visitation with Child.

The evidence does not preponderate against these findings.

- 17 -

Although Mother made several attempts at sobriety through at least three different rehabilitation programs, Mother repeatedly relapsed into methamphetamine use, admitting to at least four or five periods of time when she was using methamphetamine daily since 2015. Her lack of urgency is particularly demonstrated by her seeming uninterest in forming a relationship with the Child until September or October of 2022, seven years after the Child's removal from her custody. We accordingly agree with the Trial Court that this factor weighs in favor of termination.

In considering factor (N) (whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult), the Trial Court rightly noted Mother's conviction for severe child abuse. Her conviction makes this factor weigh in favor of termination.

Factors (O) (whether the parent has ever provided safe and stable care for the child or any other child), (P) (whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive), (Q) (whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive), and (R) (whether the physical environment of the parent's home is healthy and safe for the child) all have to do with whether the parent can meet the child's needs, provide a safe home, and provide stable care to the child. The Trial Court found that Mother had not met the requirements of these factors, and the evidence does not preponderate against those findings. Although there is no explicit reference to the language of factor (R), the Trial Court elsewhere concluded that Mother's environment would not be appropriate or safe for the Child. These factors weigh in favor of termination.

With respect to factor (S) (whether the parent has consistently provided more than token financial support for the child), the Trial Court found: "[T]here has been no provision of financial support that has been demonstrated for this child by Mother, though Mother asserts Petitioners did not want her to provide support, and no court order compelled this. Compelled or not, rejected or not, a parent must know that her minor child requires financial support." The evidence does not preponderate against these findings. Mother did not provide any financial support throughout the Child's eight years in Petitioners' custody. This factor weighs in favor of termination.

Lastly, the Trial Court considered factor (T) (whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child). The Trial Court expressed its concern with Mother's emotional fitness. The Trial Court considered Mother's "history of struggle in breaking the cycle of drug use," and her "past indifference demonstrated toward" the Child as evidence of her lack of emotional fitness. We agree.

We agree with the Trial Court's conclusion that termination of Mother's parental rights was in the Child's best interest, demonstrated by clear and convincing evidence. Although Mother has made progress in the year or two preceding the trial, the Child had been in Petitioners' care and custody for eight years. Time did not stand still for the Child. The Child has formed significant bonds with Petitioners and other family members and has settled into a stable home and life with them. At the time of trial, Mother had been sober eighteen months, which is commendable, but does not erase her eight years of absence, repeated relapses, and drug addiction. Discerning no reversible error, we affirm the Trial Court's judgment terminating Mother's parental rights to the Child.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, River M., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE